IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

INSPIRED BY DESIGN, LLC,

               Plaintiff,

v.

SAMMY'S SEW SHOP, LLC, et al.,

               Defendants.

Case No. 16-CV-2290-DDC-KGG

## MEMORANDUM AND ORDER

Plaintiff Inspired by Design, LLC brings this lawsuit against Sammy's Sew Shop, LLC and Samantha Pantaleo, asserting trade dress infringement, unfair competition, and copyright infringement claims. This matter comes before the court on plaintiff's Motion for Preliminary Injunction (Doc. 4). On September 7, 2016, the court conducted a hearing on the motion. After considering the evidence, submissions, and parties' arguments, the court now is prepared to rule. For reasons explained below, the court denies plaintiff's Motion for Preliminary Injunction.

**I.  Factual Background**

Plaintiff is a Kansas limited liability company that makes customized pet beds and pet-related products. Alisa Self formed the company on April 30, 2015. Before then, Ms. Self sold pet beds and pet-related products as a sole proprietor. On June 23, 2012, Ms. Self had started using the website, https://adorepetbeds.com, for advertising and selling her products. Then, on July 31, 2012, Ms. Self began selling her products on an Etsy webpage,[1] under the name

---

[1]      Etsy is an online marketplace where users buy and sell goods such as handmade products, vintage items, and craft supplies. *See* https://www.etsy.com/about/?ref=ftr (last visited Oct. 18, 2016). Ms. Self describes Etsy as "a peer-to-peer e-commerce website which allows users to create their own online virtual stores called 'Etsy Shops' to sell their products." Doc. 16-1 ¶ 7. Ms. Self asserts that "Etsy Shop owners have control over the content displayed and the product listings on their Etsy Shop webpages,

1

"AdoreCustomPetBeds."[2]  After Ms. Self formed the plaintiff company, plaintiff continued

selling custom pet beds through the https://adorepetbeds.com website and the Etsy webpage.

Plaintiff offers pet beds with many different fabric options.  In August 2014, plaintiff

added a fabric selector feature to its website.  This feature allows plaintiff's customers to choose

up to five different fabrics for placement on a custom-designed pet bed.  Plaintiff's most popular

pet bed is a called a "cuddle bed."  The cuddle bed is a type of pet bed known in the industry as a

bolster bed.  Plaintiff's cuddle bed has a fiberfill-stuffed seat, bolster sections, a reversible cover

with a multiple-fabric design, a dip in the front bolster section, and optional embroidery.  The

cuddle bed covers are removable, washable, and reversible, so the cover allows for two

alternative looks when it is inserted and reversed.

Beginning in September 2012, plaintiff has packaged its pet beds by wrapping them in

black toile.  In December 2014, plaintiff began using black hang tags with the black toile in its

packaging.  Around September 17, 2012, Ms. Self began including a black bar on her Etsy

listings.  The black bar contains text advertising plaintiff's pet beds.  Examples of the text in the

black bar include:  "Durable • Washable • You Design" or "Your Choice of Fabrics!"  Since

December 2013, plaintiff has advertised its pet bed using photographs of different sized pet beds

stacked on top of one another.  On April 28, 2016, plaintiff acquired a copyright covering

photographs, 2-D artwork, technical drawings, and text content published on

https://adorepetbeds.com on August 12, 2014.

---

including pricing." *Id.* ¶ 8.  She also states that Etsy Shop owners keep the profits from sales on their webpages less a $0.20 listing fee and a 3.5% commission for each transaction, which Etsy retains.  *Id.*

[2]     https://www.etsy.com/shop/AdoreCustomPetBeds.

Defendant Sammy's Sew Shop, LLC ("Sammy's") also sells custom pet beds, including bolster beds.  It began operating an Etsy webpage around December 19, 2014.[3]  It also has a Facebook webpage.[4]  Defendant Samantha Pantaleo is the owner of Sammy's.  Defendants describe Sammy's pet beds as durable and high quality.

Sammy's pet beds are custom-made based on the customer's instructions.  Sammy's Etsy webpage does not have a fabric selector tool like plaintiff uses on its website.  Instead, Sammy's directs customers to choose their own fabrics from fabric manufacturers or by visiting Sammy's facebook page where it displays photographs of fabric swatches.  When ordering a custom-made pet bed from Sammy's, a customer emails their desired fabric choices to Ms. Pantaleo.  Sammy's uses those choices, manually creating a composite swatch image with Adobe Photoshop.  The composite swatch image features the chosen fabric patterns placed next to each other.  Sammy's uses electronic copies of the chosen fabric manufacturer's swatches to create the composite swatch image.  After creating the composite swatch image, Sammy's uploads it to Etsy and makes a custom Etsy listing for the ordering customer using the customer's selected fabrics.  Then, the customer may purchase the pet bed through the custom Etsy listing.

Plaintiff accuses defendants of selling replicas of its pet beds.  Plaintiff asserts that defendants began copying plaintiff's pet beds around June 12, 2015.  Plaintiff alleges that, before defendants started copying plaintiff's pet beds, it was the only seller of pet beds containing a combination of certain features (including fiberfill-stuffed seat and bolster sections, a reversible cover with multiple-fabric design, a dip in the front bolster section, and optional embroidery).

In July 2015, an Etsy user named Tyler Gage ordered a cuddle bed from plaintiff.  Tyler Gage has a close, personal relationship with Ms. Pantaleo.  Plaintiff asserts that, around August

---

3       https://www.etsy.com/shop/SammysSewShop.

4       https://www.facebook.com/SammysSewShop.

11, 2015 (after Mr. Gage received plaintiff's cuddle bed), defendants modified Sammy's pet beds and Etsy listings to make them resemble plaintiff's cuddle beds even more. These modifications include advertising bed inserts with zippers for adjusting firmness, advertising a fabric and embroidery proofing process, and altering the dip on the front of the pet beds to match the dip on plaintiff's cuddle beds.

Also, around August 18, 2015, defendants began using a black bar containing advertising text on Sammy's Etsy listings. Plaintiff describes Sammy's pet beds as lower quality than plaintiff's pet beds. Plaintiff asserts that Sammy's uses a lower grade of fiberfill and lower quality sewing and embroidery than plaintiff uses with its products.

In response to defendants' actions, plaintiff's counsel sent a cease-and-desist letter to defendants on September 25, 2015. The letter demanded that defendants cease and desist from violating plaintiff's intellectual property rights. On October 14, 2015, defendants' counsel responded to plaintiff's letter, denying any violation of plaintiff's intellectual property rights. Nevertheless, after receiving the cease-and-desist letter, Sammy's made several changes to its advertising, including changes in its washing instructions. Defendants also noted in their October 14, 2015 response letter that Sammy's had developed a new sizing chart.

From July 31, 2012 to June 30, 2015, plaintiff sold 549 pet beds on Etsy and its website, including 321 cuddle beds. From July 1, 2015 to August 24, 2016, plaintiff sold 672 pet beds on Etsy and its website, including 421 cuddle beds. Plaintiff contends that defendant has undercut plaintiff's prices, thereby forcing plaintiff to decrease its prices for pet beds significantly several times. Plaintiff also asserts that, after defendants began selling their pet beds, plaintiff has experienced lower than expected sales increases. On November 18, 2015, plaintiff discovered one case of actual customer confusion between plaintiff and defendants' products. On this one

4

occasion, a customer sent a message to Ms. Self.  In it, the customer expressed an interest in purchasing one of plaintiff's pet beds but attached a picture of one of Sammy's pet beds.

On May 5, 2016, plaintiff sued defendants in this action.  The Complaint asserts trade dress infringement and unfair competition claims under the Lanham Act, 15 U.S.C. § 1125, and a copyright infringement claim under the federal Copyright Act, 17 U.S.C. § 501.  Doc. 1. Plaintiff's Motion for Preliminary Injunction seeks an injunction prohibiting defendants from: (1) misusing plaintiff's trade dress, (2) misrepresenting the nature, characteristics, and quality of defendants' goods, services, or commercial activities, (3) engaging in unfair competition with plaintiff, (4) infringing on plaintiff's copyright content, and (5) deleting or destroying records pertaining to the causes of actions asserted in this case.[5]  Doc. 16 at 1–2.

At oral argument, plaintiff refined its request for injunctive relief stating that it seeks an injunction prohibiting defendants from copying the "look and feel" of plaintiff's products which would include prohibitions against defendants (1) using three or more fabrics in their pet bed designs, and (2) marketing defendants' pet beds using the black bar that plaintiff uses.  Plaintiff also seeks an injunction prohibiting defendants from making misstatements about their pet bed products, including any representation that they are waterproof.

In a supplemental filing, plaintiff states that it seeks an injunction enjoining defendants from:  (1) selling bolster pet beds having three or more contrasting fabrics; (2) posting Etsy listings or otherwise publishing advertising content including horizontal bars or stripes and contrasting text; (3) posting Etsy listings or otherwise publishing advertising content including bolster pet beds with three or more contrasting fabrics per bed; and (4) wrapping pet beds in black toile.  Doc. 24 at 4–5.

---

[5]       At oral argument, plaintiff conceded that the Federal Rules obligate defendants to preserve relevant evidence and that plaintiff has no reason to believe that defendants are failing to honor their preservation obligations.

## II.     Legal Standard

Federal Rule of Civil Procedure 65(a) authorizes district courts to issue preliminary injunctions.  The relief afforded under this rule has a limited purpose—a preliminary injunction is "merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981).  To prevail on a motion for preliminary injunction, the movant must demonstrate that:  (1) it is substantially likely to succeed on the merits; (2) it will suffer irreparable injury if the injunction is denied; (3) its threatened injury outweighs the injury the opposing party will suffer under the injunction; and (4) the injunction, if issued, will not be adverse to the public interest.  *Winter v. Nat'l Res. Defense Council, Inc.*, 555 U.S. 7, 20 (2008); *Verlo v. Martinez*, 820 F.3d 1113, 1126 (10th Cir. 2016).

Whether to grant a preliminary injunction rests within the court's sound discretion. *Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC*, 562 F.3d 1067, 1070 (10th Cir. 2009). But the controlling cases view a preliminary injunction as an extraordinary remedy.  *Winter*, 555 U.S. at 24.  So, the right to such relief must be "clear and unequivocal."  *Petrella v. Brownback*, 787 F.3d 1242, 1256 (10th Cir. 2015) (quoting *Beltronics, USA, Inc.*, 562 F.3d at 1070).  "In general, 'a preliminary injunction . . . is the exception rather than the rule.'"  *Gen. Motors Corp. v. Urban Gorilla, LLC*, 500 F.3d 1222, 1226 (10th Cir. 2007) (quoting *GTE Corp. v. Williams*, 731 F.2d 676, 678 (10th Cir. 1984)).

## III.     Analysis

### A.  Likelihood of Success on the Merits

When the requested injunctive relief is one that alters the status quo, the relief is disfavored and requires the party seeking the injunction to make a "strong showing" of both the likelihood of success on the merits and that the balance of the harms favors issuing the requested

injunction.  *N. Nat. Gas Co. v. L.D. Drilling, Inc.*, 697 F.3d 1259, 1266 (10th Cir. 2012) (citing *Flood v. ClearOne Commc'ns, Inc.*, 618 F.3d 110, 1117 n.1 (10th Cir. 2010)).  Here, plaintiff seeks injunctive relief that, among other things, would prohibit defendants from selling pet beds using three or more fabrics.  This relief would alter the status quo.  To obtain the requested injunctive relief, plaintiff thus must make a strong showing that it is likely to succeed on the merits.  *See Gen. Motors Corp.*, 500 F.3d at 1227 (explaining that the moving party must make a strong showing on the likelihood of success on the merits because the requested injunctive relief sought to halt production of defendants' products).  For the reasons explained, plaintiff has not shouldered this burden on any of the three claims it asserts in this action.

### 1.  Trade Dress Infringement

The Lanham Act, 15 U.S.C. § 1125(a), provides a federal cause of action for trade dress infringement.  *Gen. Motors Corp.*, 500 F.3d at 1226.  "A product's trade dress 'is its overall image and appearance, and may include features such as size, shape, color or color combinations, texture, graphics, and even particular sales techniques.'"  *Id.* (quoting *Sally Beauty Co., Inc. v. Beautyco, Inc.*, 304 F.3d 964, 977 (10th Cir. 2002)).  To prevail on a trade dress infringement claim, a plaintiff must show:  "(1) The trade dress is inherently distinctive or has become distinctive through secondary meaning; (2) There is a likelihood of confusion among consumers as to the source of the competing products; and (3) The trade dress is nonfunctional."  *Id.* (first citing *Sally Beauty*, 304 F.3d at 977; then citing 15 U.S.C. § 1125(a)(3)).

Here, plaintiff asserts that the "look and feel" of its products, as well as its advertising and marketing, are protectable trade dress.  Plaintiff contends that its cuddle beds include a combination of features that create an overall commercial image and appearance.  This combination includes fiberfill-stuffed seat and bolster sections, a reversible cover with a

multiple-fabric design having many different fabric options, a dip in the front bolster section, and optional embroidery.  The multiple-fabric cover design includes different fabrics for each section of the inside of the seat, the bottom of the seat, the inside portion of the bolsters, the outside portion of the bolsters, and cording across the top of the bolsters.  Plaintiff asserts that its combination of these features create plaintiff's trade dress.  Plaintiff also asserts that it has developed an overall image and appearance with its advertised listings and packaging. Specifically, plaintiff contends that its use of the black bar to advertise its listings and its packaging of products using black toile and black hang tags creates a protectable trade dress.

Defendants respond that plaintiff has no protectable trade dress over its products or its marketing because it cannot establish all three required elements of a trade dress claim.  The court agrees.  Based on the current record, plaintiff has not shown a likelihood that it will succeed on the first and third elements of a trade dress claim—*i.e.*, that the trade dress is inherently distinctive or has become distinctive through secondary meaning or that it is nonfunctional.  As such, the court need not address the second element of a trade dress claim. Below, the court explains why plaintiff has failed to show a likelihood of success on the first and third elements.

### a.  Inherently distinctive or distinctive through secondary meaning

"A trade dress is inherently distinctive if its 'intrinsic nature serves to identify a particular source.'"  *Savant Homes, Inc. v. Collins*, 809 F.3d 1133, 1147 (10th Cir. 2016) (quoting *Sally Beauty*, 304 F.3d at 977).  "Trade dress, like trademarks, are classified in the following categories of generally increasing distinctiveness:  (1) generic, (2) descriptive, (3) suggestive, (4) arbitrary, or (5) fanciful."  *Id.* (first citing *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992); then citing *Sally Beauty*, 304 F.3d at 977).

Here, plaintiff never asserts the category into which its purported trade dress falls. Instead, plaintiff just offers the conclusory assertion that its trade dress is distinctive and relies only on its cuddle bed's combination of features to prove distinctiveness. But the Tenth Circuit has rejected this approach, holding that "merely reciting . . . elements [of an alleged trade dress] does not [establish] inherent distinctiveness." *Id.* at 1149. A plaintiff seeking to assert a trade dress claim must show that the elements of the asserted trade dress are "original or unique so as to make the alleged trade dress inherently source-identifying (meaning suggestive, arbitrary, or fanciful)." *Id.*

Moreover, defendants assert that plaintiff has failed to show distinctiveness because many other pet bed manufacturers use the same elements or combination of elements when producing pet bolster beds. Again, the court agrees with defendants. The record shows that other sellers use fiberfill stuffing, reversible covers, multiple fabrics, a dip in the front, and embroidery when manufacturing their pet beds. Plaintiff cannot claim distinctiveness over elements that are commonly used by others in the industry. *See id.* at 1149 (holding that plaintiff's failure to rebut evidence showing that the purported trade dress consisted of standard elements and content in the industry precluded a finding of inherent distinctiveness). Also, the court is skeptical that the use of multiple fabrics and embroidery makes plaintiff's pet beds distinctive when the customer has the option to choose these features and thus the customer creates the "look" of the bed by selecting the fabrics and type of embroidery.

Plaintiff also has not presented sufficient evidence to show it likely will demonstrate that its marketing techniques are distinctive. Plaintiff does not always use the black bar to advertise on its website, and the record includes examples of other sellers who use the black bar in similar

ways to market products.  Also, the use of black ribbons and packaging are relatively common, not inherently distinctive.

But, even if trade dress is not inherently distinctive, it is protectable if it has acquired secondary meaning.  *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 210 (2000).  A trade dress acquires secondary meaning "when, 'in the minds of the public, the primary significance of a [mark] is to identify the source of the product rather than the product itself.'"  *Id.* (quoting *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 851 n.11 (1982)).  A plaintiff asserting a trade dress may establish secondary meaning "through 'direct evidence, such as consumer surveys or testimony from consumers.'"  *Forney Indus., Inc. v. Daco of Mo., Inc.*, __ F.3d __, 2016 WL 4501941, at *9 (10th Cir. Aug. 29, 2016) (quoting *Donchez v. Coors Brewing Co.*, 392 F.3d 1211, 1218 (10th Cir. 2004)).  A plaintiff also may rely on circumstantial evidence to demonstrate trade dress, such as:

> (1) the length and manner of the trade dress's use; (2) the nature and extent of advertising and promotion of the trade dress; (3) the efforts made in the direction of promoting a conscious connection, in the public's mind, between the trade dress and a particular product or venture; (4) actual consumer confusion; (5) proof of intentional copying; or (6) evidence of sales volume.

*Id.* (citing *Savant Homes*, 809 F.3d at 1148).

Plaintiff has presented no direct evidence of secondary meaning.  Plaintiff instead asserts that circumstantial evidence establishes secondary meaning, but it only cites defendants' alleged copying of plaintiff's products and marketing.  But the court does not find this evidence particularly compelling when, as previously described, other market participants use the same elements and combinations of elements when they make and sell their pet bed products.

Plaintiff also asserts that it has used its trade dress exclusively since 2012, and provides evidence of its sales volume during this time.  But plaintiffs' sales of 1,221 pet beds (742 of

which were cuddle beds) over that four-year period is insufficient sales volume to establish
secondary meaning when plaintiff provides no evidence tying its sales to its alleged trade dress.
*See*, *e.g.*, *Forey Indus.*, 2016 WL 4501941, at *10 (concluding that over half a billion dollars in
sales was "unavailing" when it "gave no indication of how those sales relate" to the trade dress);
*Black & Decker Corp. v. Dunsford*, 944 F. Supp. 220, 270 & n.10 (S.D.N.Y. 1996) (concluding
that $80,000 in sales after more than five years of production was "minimal commercial activity"
insufficient to "come close to meeting the substantial level of sales volume required for a
showing of secondary meaning").

Plaintiff has adduced just one example of actual customer confusion.  But this lone
example—a customer sending an email to plaintiff that included a picture of one of defendants'
pet beds—does not present sufficient circumstantial evidence, standing alone, to support a
finding of secondary meaning.  *See*, *e.g.*, *Test Masters Educ. Servs. v. Singh*, 46 F. App'x 227,
2002 WL 1940083, at *4 (5th Cir. July 24, 2002) (holding that a series of email messages
showing actual customer confusion was insufficient when "[b]esides [these] messages, there
[was] little or no evidence regarding secondary meaning"); *Del. Valley Fin. Grp., Inc. v.
Principal Life Ins. Co.*, 640 F. Supp. 2d 603, 623  (E.D. Pa. 2009) (holding that some initial
confusion by customers that was later resolved failed to establish secondary meaning).  Plaintiff
thus has not shown a likelihood of proving that its trade dress has secondary meaning.

### b.  Functionality

The Supreme Court has promulgated two tests for determining the functionality of a trade
dress.  First, the Supreme Court has explained that "'a product feature is functional,' and cannot
serve as a trademark, 'if it is essential to the use or purpose of the article or if it affects the cost
or quality of the article.'"  *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 32 (2001)

(quoting *Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 165 (1995)).  Second, a product

feature is functional if it "is one the 'exclusive use of [which] would put competitors at a

significant non-reputation-related disadvantage.'"  *Id.* (quoting *Qualitex*, 514 U.S. at 165); *see*

*also Hartford House Ltd. v. Hallmark Cards, Inc.*, 846 F.2d 1268, 1273 (10th Cir. 1988) ("[T]he

issue of functionality turns on whether protection of the combination would hinder competition

or impinge upon the rights of others to compete effectively.").  The party asserting trade dress

infringement bears the burden of demonstrating that the trade dress is non-functional.  *See*

*Samara Bros.*, 529 U.S. 205, 210 (2000) (citing 15 U.S.C. § 1125(a)(3)); *see also Sally Beauty*,

304 F.3d at 977 (first citing 15 U.S.C. § 1125(a)(3); then citing *Samara Bros.*, 529 U.S. at 210).

Plaintiff's written submissions fail to explain how its trade dress is nonfunctional under

the Supreme Court's standards, and thus protectable under the Lanham Act.  Plaintiff identifies

several cuddle bed features that, it claims, create an overall commercial image and appearance

for its products.  These features include the use of fiberfill stuffing, reversible covers, the dip in

the front, multiple fabrics, and optional embroidery.  The Tenth Circuit has explained that "[a]

combination of features may be nonfunctional and thus protectable, even though the combination

includes functional features."  *Hartford House*, 846 F.2d at 1272.  Thus, "the appropriate

inquiry" for determining functionality is "whether the whole collection of features, taken

together, is functional."  *Id.*  Applying this inquiry to the facts here, plaintiff has not shown a

likelihood of success of proving that the features of its cuddle bed, when taken together, are

nonfunctional features under either Supreme Court test.

Under the first Supreme Court test, the identified features are essential to the use of the

cuddle bed.  The fiberfill stuffing fills the inside of the pet bed, thereby functioning as the bed's

padding.  The reversible cover serves the function of allowing the consumer to flip the bed over

for use of the reverse side; *i.e.*, it "is the reason the device works." *TrafFix Devices*, 532 U.S. at 34. The dip in the front performs the function of providing a place for the pet to enter the bed. And the embroidery provides the function of personalizing the pet bed. The only potentially non-functional item in plaintiff's list of features is the use of multiple fabrics on different parts of the bolster bed, but, as plaintiff concedes, its customers choose the colors and placement of the fabrics on the cuddle bed. The process of choosing different fabric patterns and arrangements on the pet bed arguably is also functional to use—its serves the function of allowing the customer to design the pet bed to their liking. Though plaintiff contends that this combination of features have created a "look and feel" for its cuddle beds that is subject to protection, these features improve the quality and performance of the pet bed product, and thus are essential to its use.

But, even if the features were not essential to the pet bed's use, plaintiff has failed to establish a likelihood that it will prove functionality under the second Supreme Court test. As described above, this test considers "whether the use of [a claimed trade dress] would put competitors at a significant non-reputation-related disadvantage." *See TrafFix Devices,* 532 U.S. at 32. In the same vein, a court should consider whether "protection of the combination would hinder competition or impinge upon the rights of others to compete effectively." *Hartford House*, 846 F.2d at 1273. Prohibiting defendants from selling bolster pet beds that include three or more fabrics—as plaintiff asks the court to order—would do just that. The injunctive relief plaintiff seeks, if granted, would thwart competition and encroach on others' rights by limiting the type of pet bed designs that defendants—and perhaps others—could sell to customers.

Moreover, the record shows that defendants are not alone. Many other competitors in the industry make pet beds using almost the same combinations of the features that plaintiff claims are part of its trade dress. This lends additional support for the functionality of plaintiff's trade

dress.  *See Hartford House*, 846 F.2d at 1273 ("If that feature [or combination of features] must be slavishly copied in order to have an equally functional product, then the feature [or combination] is not entitled to protection." (quoting *Brunswick Corp. v. Spinit Reel Co.*, 832 F.2d 513, 519 (1987))).

Plaintiff also has failed to show a likelihood of proving that protecting its marketing techniques would not hinder competition or impinge the rights of others.  Prohibiting a competitor from using a black bar to offset advertising text or from packaging its products with black toile and black hang tags would hinder competition.  The relief plaintiff requests would limit defendants' ability to market their products using techniques that other sellers use—not only on Etsy[6]–but also elsewhere.  The court thus finds that plaintiff has not shown a likelihood of success of proving that the claimed trade dress is nonfunctional and thus protectable under the Lanham Act.

In sum, plaintiff has failed to demonstrate a substantial likelihood that it ultimately will prevail on the merits of its trade dress claim asserting a violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

---

[6]    *See, e.g.*, https://www.etsy.com/listing/223912301/sale-reversible-durable-organic-cotton?ga_order=most_relevant&ga_search_type=all&ga_view_type=gallery&ga_search_query=dog bed cover&ref=sr_gallery_38 (last visited Oct. 18, 2016) (using a black bar to advertise the price of a dog bed cover); https://www.etsy.com/listing/266252146/mermaid-tail-blanket-child-mermaid?ga_order=most_relevant&ga_search_type=all&ga_view_type=gallery&ga_search_query=blankets&ref=sr_gallery_17 (last visited Oct. 18, 2016) (using a black bar to identify different color options for a blanket); https://www.etsy.com/listing/207219767/pride-and-prejudice-book-scarf?ga_order=most_relevant&ga_search_type=all&ga_view_type=gallery&ga_search_query=scarves&ref=sc_gallery_7&plkey=dfd5de88173d7e3fda6031caac546f052a0ff591:207219767 (last visited Oct. 18, 2016) (using a black bar to market a scarf).  Although these Etsy listings are not part of the record submitted by the parties, the court may take judicial notice of the fact that these listings using a black bar appear on the internet.  *See New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 702 (10th Cir. 2009) (citing Fed. R. Evid. 201(b)); *O'Toole v. Northrop Grumman Corp.*, 499 F.3d 1218, 1225 (10th Cir. 2007) ("It is not uncommon for courts to take judicial notice of factual information found on the world wide web." (further citation omitted)).

### 2.   Unfair Competition

Plaintiff's second claim is one for unfair competition under the Lanham Act.  Plaintiff asserts that defendants have engaged in unfair competition by making false or misleading representations about Sammy's products.  Plaintiff alleges that defendants have falsely advertised Sammy's pet beds as "high quality" but the beds have poor support and shape, display crooked embroidery, and use an inferior quality of fabrics.

The Lanham Act imposes liability on a person who "in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographical origin of his or her or another person's goods, services, or commercial activities."  15 U.S.C. § 1125(a)(1)(B); *see also Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1284 (2014) (explaining that the Lanham Act, 15 U.S.C. § 1125(a)(1)(B), prohibits false advertising).

To prevail on a claim of false or misleading representations under the Lanham Act, a plaintiff must establish that:  "(1) that defendant made material false or misleading representations of fact in connection with the commercial advertising or promotion of its product; (2) in commerce; (3) that are either likely to cause confusion or mistake as to (a) the origin, association or approval of the product with or by another, or (b) the characteristics of the goods or services; and (4) injur[y] [to] the plaintiff."  *Cottrell, Ltd. v. Biotrol Int'l, Inc.*, 191 F.3d 1248, 1252 (10th Cir. 1999).

Recently, the Tenth Circuit concluded that "general advertising claims of best practices and high-quality customer service" are puffery—an expression of a seller's opinion—and not false or misleading statements of fact sufficient to support a Lanham Act claim.  *See Intermountain Stroke Ctr., Inc. v. Intermountain Health Care, Inc.*, 638 F. App'x 778, 786 (10th Cir. 2016) (affirming dismissal of plaintiff's Lanham Act claims and holding that defendant's

"general quality-of-care declarations are emblematic of sales puffery" and for this reason, the Circuit could not "classify these declarations as statements of fact, much less literally false ones").

Likewise, plaintiff has not shown a likelihood of success in proving that defendants' statements about the "high quality"[7] of Sammy's products are actionable as false and misleading statements under the Lanham Act.  Instead, these statements are similar to those at issue in *Intermountain Stroke Center*—they are subjective statements that one cannot prove true or false and thus constitute sales puffery.  *Id.* at 788–89; *see also W. Chem. Pumps, Inc. v. Superior Mfg., Inc.*, 989 F. Supp. 1112, 1130 (D. Kan. 1997) (holding that plaintiff failed to establish that defendant's advertising was false so as to support a Lanham Act claim when plaintiff merely questioned defendant's "claims of quality and dependable service").

### 3.  Copyright Infringement

Plaintiff asserts a copyright infringement claim under the federal Copyright Act, 17 U.S.C. § 501.  Plaintiff owns a U.S. Copyright covering photographs, 2-D artwork, technical drawings, and text content published on https://adorepetbeds.com on August 12, 2014.  And plaintiff accuses defendants of copying plaintiff's copyrighted material.   More specifically, plaintiff asserts that defendants' Etsy listing includes substantially similar, infringing works.

To establish a copyright infringement claim, a plaintiff must show: "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original."  *Savant*

---

[7]      Plaintiff's unfair competition claim is based on the following allegations in the Complaint: "Sammy's advertises using high end materials, performing seamstress quality sewing, and producing high quality products.  However, Sammy's uses an inferior quality of fiberfill within its pet beds, as compared to [plaintiff], and produces lower than seamstress quality sewing."  Doc. 1 ¶ 30.  At oral argument, plaintiff raised a different assertion.  It argued that defendants' claim of offering "waterproof" inserts for its pet beds is materially false because, as Ms. Self testified, no fabric is waterproof, but instead is water repellent.  Because plaintiff's unfair competition claim is premised on defendants' assertions of "high quality," not waterproofing, the court declines to address this new assertion.

*Homes, Inc. v. Collins*, 809 F.3d 1133, 1138 (10th Cir. 2016) (first quoting *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991); then citing *Blehm v. Jacobs*, 702 F.3d 1193, 1199 (10th Cir. 2012)).  Defendants do not dispute that plaintiff owns a valid copyright to certain content published on its website on August 12, 2014.  But defendants assert that they have not copied any protected material.

Whether defendants have copied plaintiff's copyrighted material "involves two separate inquiries:  (1) whether the defendant, as a factual matter, copied portions of the plaintiff's [work]; and (2) whether, as a mixed issue of fact and law, those elements of the [work] that have been copied are protected expression and of such importance to the copied work that the appropriation is actionable."  *Gates Rubber Co. v. Bando Chem., Indus., Ltd.*, 9 F.3d 823, 832 (10th Cir. 1993).  A party asserting a copyright infringement claim can show copying "either through the presentation of direct evidence, or through indirect evidence that shows (1) that the defendant had access to the copyrighted [work], and (2) that there are probative similarities between the copyrighted material and the allegedly copied material."  *Id.* (citing *Autoskill Inc. v. Nat'l Educ. Support Sys., Inc.*, 994 F.2d 1476, 1487 (10th Cir. 1993) (further citations omitted)). The inquiry does not end with a finding that the defendant copied some aspect of the plaintiff's work—liability attaches only when a defendant copies "protected elements of a copyrighted work."  *Country Kids 'N City Slicks, Inc. v. Sheen*, 77 F.3d 1280, 1284 (10th Cir. 1996).  "[T]he mere fact that a work is copyrighted does not mean that every element of the work may be protected."  *Feist Publ'ns*, 499 U.S. at 348.  "Originality remains the *sine qua non* of copyright; accordingly, copyright protection may extend only to those components of a work that are original to the author."  *Id.*

Plaintiff asserts that defendants have copied the following:  (1) photographs of dog beds; (2) washing instructions for the pet bed covers; (3) the fabric selector diagram; and (4) a pet bed size chart with size recommendations.  Doc. 16 at 19.  Defendants respond, saying plaintiff is not likely to prevail on a copyright infringement claim based on any of these works.

First, defendants deny that they have copied plaintiff's photographs.  Indeed, plaintiff presented no evidence of verbatim copying of photographs.  Instead, plaintiff alleges that defendants have infringed on its copyright by posting photographs containing similarly made pet beds taken from similar angles with similar backgrounds.  But, when photographs "serve the utilitarian purpose of presenting the various types of products and services that the businesses offer," they are "purely descriptive pictures" that "do not merit copyright protection because the photographs lack the requisite creativity."  *Harner v. Wong Corp.*, No. 1:12-cv-00820-KG-ACT, 2013 WL 11549284, at *6 (D.N.M. Oct. 31, 2013); *see also Ets-Hokin v. Skyy Spirits, Inc.*, 323 F.3d 763, 766 (9th Cir. 2003) (holding that photographs of a liquor bottle indeed were similar "given the shared concept, or idea of photographing" the bottle and that "only virtually identical copying" deserved protection).  Similarly, the photographs at issue here are descriptive pictures presenting the types of pet beds available for sale.  Plaintiff is not likely to prevail on her assertion that these photographs are subject to copyright protection.

Second, defendants assert that plaintiff does not have a valid copyright on the washing instructions since they simply are the fabric manufacturer's instructions.  Thus, defendants contend, copyright protection does not extend to washing instructions because they are not a work that is original to the author.  *See Feist Publ'ns*, 499 U.S. at 348 (explaining that copyright protection extends only to the author's original work).  Plaintiff never has responded to this argument.  Failing to provide more information about the origin of the washing instructions,

plaintiff has failed to show that it is likely to prevail on its claim of copyright infringement for this aspect of the allegedly copyrighted work.[8]

Third, defendants deny using plaintiff's fabric selector.  Instead, defendants explain that Sammy's customers select fabrics from a webpage or outside vendors, and then Ms. Pantaleo puts them into Adobe Photoshop for the customer to view.  Defendants also assert that the fabric selector that plaintiff uses is an open source application available to anyone and not protectable. Plaintiff disputes defendants' denial.  Plaintiff relies on an Etsy posting (Doc. 16-2 at 57) and an Etsy conversation between Ms. Pantaleo and a customer (Hr'g Exs. 23) to support its assertion of copying.  In both, defendants presented fabric choices in a manner similar to how plaintiff's fabric selector displays a customer's fabric choices.  The parties strongly dispute these facts at this stage of the litigation, and plaintiff ultimately could prevail in proving its version of the facts.  But, at this stage of the proceeding, plaintiff has not shouldered its burden of proving a likelihood of success or proving copyright infringement of the fabric selector.

Fourth, defendants assert that plaintiff does not have a valid copyright on its size chart because it is not an original work protectable by copyright.  *See Feist Publ'ns*, 499 U.S. at 348. Defendants describe the chart as listing pet bed sizes that are typical sizes in the industry with associated dimensions for each size.  Defendants assert that this information is factual, not original work protectable by copyright.  And defendants point to other, similar size charts that

---

[8]    Even if plaintiff could show a likelihood of success of proving copyright infringement based on the washing instructions, plaintiff's request for injunctive relief is moot.  Defendants assert that they changed Sammy's washing instructions after receiving the cease-and-desist letter in September 2015, and thus there is nothing for the court to enjoin.  A preliminary injunction is not warranted "if there is no likelihood that the complained of behavior will continue," and "if the movant is no longer in harm's way, his motion for injunctive relief becomes moot."  *Pharmanex, Inc. v. HPF*, 221 F.3d 1352, 2000 WL 703164, at *2 (10th Cir. Apr. 20, 2000) (first citing *SEC v. Pearson*, 426 F.2d 1339, 1343 (10th Cir. 1970); then citing *Taylor v. Resolution Tr. Corp.*, 56 F.3d 1497, 1502 (D.C. Cir. 1995)).  Defendants have ceased the complained-of behavior, and plaintiff presents no evidence showing it is likely to resume. Thus, plaintiff is no longer in harm's way, and the relief sought—an injunction prohibiting defendants from using the washing instructions—is moot.

Etsy users have published on their websites.  Based on the current record, plaintiff has not established a likelihood of prevailing on its copyright infringement claim for the size chart.[9]

Finally, in its supplement, plaintiff asserts that defendants have not stopped infringing on its copyrighted work.  Plaintiff contends that defendants have continued to sell products that are confusingly similar to plaintiff's products and to advertise with confusingly similar or copied Etsy content.  Doc. 24 at 3.  But plaintiff does not have a valid copyright over the actual pet bed or any of its Etsy content.  Plaintiff's copyright is confined to certain content published on its website on August 12, 2014.  Thus, plaintiff cannot assert a copyright infringement claim over these works.  In sum, plaintiff has not shown a likelihood of succeeding on the merits of its copyright infringement claim.

### B.  Irreparable Harm

Because the court concludes that plaintiff has not established a likelihood of success on the merits, it could stop the analysis here as plaintiff has not shouldered the burden necessary for obtaining injunctive relief.  The court nevertheless considers the other requirements for a preliminary injunction.  Plaintiff cannot satisfy the remaining elements either.

A plaintiff establishes irreparable harm by demonstrating "a significant risk that he or she will experience harm that cannot be compensated after the fact by monetary damages."  *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1210 (10th Cir. 2009) (quoting *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1258 (10th Cir. 2003)).  A claim of "purely speculative" harm does not suffice.  *Id.*  Instead, a plaintiff must show that "significant risk of irreparable harm" is present to meet the burden.  *Id.* (quoting *Greater Yellowstone*, 321 F.3d at 1260).  Moreover,

---

[9]     Plaintiff's request for injunctive relief as it pertains to the size chart is also moot.  Defendants state that they removed the allegedly infringing material after receiving the cease-and-desist letter and created a new chart (which they, in turn, accuse plaintiff of copying).  Because the complained-of behavior has ceased, and no evidence exists showing a likelihood that it will continue, the requested injunctive relief for the size chart is moot.  *See supra* n.8.

wholly conclusory statements do not amount to irreparable harm.  *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1261 (10th Cir. 2004).  The court must determine if the harm is likely to take place before a ruling on the merits.  *RoDa Drilling Co.*, 552 F.3d at 1210.

Here, plaintiff asserts that it has suffered irreparable harm because defendants' alleged infringement has caused it to lose profits, customers, reputation, and goodwill.  But, as the court concluded above, plaintiff has not shown that it is likely to prevail on its claims that defendants have infringed any protected trade dress or copyrighted work.  Thus, plaintiff cannot make the necessary showing that it will sustain irreparable harm in the absence of an injunction.  *See Gen. Motors Corp.*, 500 F.3d at 1230 (holding that the district court was "not obligated to find irreparable injury" when plaintiff "made an insufficient showing" of infringement and "monetary compensation may well be ample and sufficient in the event that [plaintiff] ultimately prevails."); *see also Buca, Inc. v. Gambucci's, Inc.*, 18 F. Supp. 2d 1193, 1211 (D. Kan. 1998) (finding irreparable harm improbable in light of its conclusion that plaintiff was unlikely to prevail on its trade dress claim).

### C.  Balance of Harms

Absent a showing of irreparable harm to plaintiff, the balance of harms swings in defendants' favor.  An injunction will cause great harm to defendants because it will completely preclude Sammy's from selling its pet beds.  Thus, on balance, the hardship to plaintiff does not outweigh the likely hardship defendants will suffer if the court issues the requested injunctive relief.  *See Gen. Motors Corp.*, 500 F.3d at 1230 (affirming the denial of plaintiff's motion for preliminary injunction and holding that the district court "properly considered the financial hardship to [defendant] that would result from a preliminary injunction"); *see also Buca*, 18 F.

Supp. 2d at 1211 (denying a motion for preliminary injunction because the requested injunctive relief would disturb the status quo and seriously impair defendant's ability to continue operating).

### D.  Public Interest

Finally, the court concludes that issuing an injunction here is adverse to the public interest.  The public's interest is not served by restraining competition—something an injunction will do here by prohibiting defendants from selling its pet beds with three or more contrasting fabrics.  Indeed, and as defendants note, plaintiff claims that it has decreased its prices because of competition by Sammy's.  This actually serves the public's interest because competition causing prices to fall enables consumers to pay less for pet bed products.  *See Buca*, 18 F. Supp. 2d at 1212 (denying a motion for preliminary injunction and concluding that the "public interest is best served, at this stage of the proceedings, by allowing defendants to continue to operate their restaurants with their current trade dress" in competition with plaintiff).

### IV.    Conclusion

The court concludes that plaintiff has not shouldered the burden imposed by the four requirements for a preliminary injunction.  Perhaps plaintiff will make a different showing when its claims are tried on their merits.  But, for now, nothing warrants the injunction sought by plaintiff's Motion for Preliminary Injunction.

**IT IS THEREFORE ORDERED BY THE COURT THAT** the plaintiff's Motion for Preliminary Injunction (Doc. 4) is denied.

**IT IS SO ORDERED.**

**Dated this 19th day of October, 2016, at Topeka, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**